HOLT, APPELLEE, *v.* CITY OF CINCINNATI, APPELLANT.

[Cite as Holt v. City of Cincinnati, 4 Ohio App. 2d 119.]

(No. 9455—Decided May 25, 1964.)

*Messrs. Lindhorst & Dreidame,* for appellee.

*Mr. William A. McClain,* city solicitor, and *Messrs. Rendigs, Fry, Kiely & Dennis,* for appellant.

HOVER, P. J. This is an appeal on questions of law from a verdict and judgment in the court below awarding damages to the plaintiff, appellee herein, for negligence on the part of servants of the defendant, appellant herein, in the operation of a certain facility owned by the defendant and known as Holmes Hospital.

The principal and controlling question is whether this institution is a governmental or proprietary function of the city of Cincinnati. Other alleged errors, relative to certain special charges and the admission and rejection of evidence, are dependent upon the correct determination of the legal status of the institution in the particular mentioned above.

The record indicates that, viewed from normal and commonplace legal terminology, the institution commonly known as Holmes Hospital is neither "flesh, fowl, or good red herring."

It has no independent existence; it is not a corporation; it is not a part of instruction school; nor is it a public facility except as to ownership. The uncontradicted state of the record indicates that this facility is loosely related to the College of Medicine, which is an integral part of the University of Cincinnati which, in turn, is a wholly owned municipal university of the defendant.

Reference to the testimony of a vice-president of the University of Cincinnati and the assistant clerk of its board of directors, indicates that Holmes is regarded as a "faculty hospital." The witness expresses the belief, from his knowledge of the institution, that it engages in undergraduate and graduate instruction for interns and residents on its staff. However, the Holmes staff is automatically composed of the full-time members of the faculty of the College of Medicine. Incidental and necessary employees are hired by the University of Cincinnati which handles the institution's business affairs simply as a bookkeeping account. The University receives all income derived from Holmes and pays all its bills. It is apparently self-supported entirely from the fees paid by its patients, all of whom are required to pay in full whatever may be the appropriate cost of their individual hospitalization. The building was built largely by donated funds and is erected on land owned by the city of Cincinnati.

The facility permits members of the College of Medicine faculty to practice medicine on their own behalf through means of the facilities provided by the city. The hospital maintains certain rooms for private consultation of patients of the medical staff. Admissions to the hospital are confined to such patients, but the hospital does not intrude upon or control the doctor-patient relationship, each doctor being permitted to charge his own fees directly to his own patients.

The testimony of the witness referred to above is confirmed to some degree by a documentary exhibit received at the trial. There is, however, a notable lack of documentation or detail relative to the claim that the institution is used for undergraduate and graduate instruction for interns on the staff. While this may have been an original, and possibly even a continuing, intention, there is no evidence to indicate that this is in fact a part of the present operation of the institution. On the other

hand, certain of the documentation received in evidence indicates rather clearly an intention to maintain this facility as it has been hereinabove described—a faculty hospital.

A resolution of the Board of Directors of the University of November 3, 1925, states in part that the control and management of the hospital and its use shall be for such purposes and upon such terms and conditions governing admissions, treatment and charges, as the board may, from time to time, prescribe. Apparently, the board undertook to do so by resolution of April 2, 1929, which limits admissions to the hospital to those patients under the care of a member of the College of Medicine faculty, and even such admissions shall be limited to persons able to pay the full cost of care and treatment. It is provided further that such costs do not include physician or surgeon charges, which charges the patient must arrange direct with the faculty members rendering the services. The regulations set out further that the hospital shall provide office and examination rooms for the use of any member of the College of Medicine faculty in consulting with and examining his patients.

In the instant case, it is interesting to note the statement of the plaintiff, to the effect that his doctor (a member of the medical staff) "put him in Holmes. They were friends."

The result of the entire record in this respect is to establish clearly that while this institution may be publicly owned there is nothing in this record to indicate that it is publicly used. The question of what is and is not a governmental function is frequently very difficult of determination, but no instance has been cited to this court, nor has the court been able to find one, in which it is claimed that a service performed by or through a municipal corporation can possibly be governmental when there is no indication of the conferring of a service upon the public. The case of *Lloyd* v. *City of Toledo*, 42 Ohio App. 36, contains an attempt to determine when the operation of a hospital constitutes a governmental function with its attendant immunities. It will be noted that a *sine qua non* of a hospital as a governmental function is its use and availability to the public at large and not to some selected or particular segment of it. See, also, in this respect, *Eversole* v. *City of Columbus*, 169 Ohio St. 205 (an arts and crafts center). See, also, *Hyde* v. *City of Lakewood*, 175 N. E. 2d 323, in

which the ultimate question of a governmental function was not decided, but it was pointed out, and correctly so, that the mere public ownership and operation of a hospital did not make it governmental.

The case of *Wolf* v. *Ohio State University Hospital*, 170 Ohio St. 49, is not helpful here for the reason that the question of a governmental or proprietary function was not involved, the only point at issue being the long-established principle that the sovereign may not be sued without its consent.

The claim is further made that even if Holmes is not an example of a hospital operated as a governmental function, it is such an adjunct to the University of Cincinnati, an educational institution, that a governmental immunity may be derived from this source.

The situation here is much the same. There is no doubt that Holmes is owned and operated as a part of the University of Cincinnati, but the record is almost totally deficient to show that Holmes is operated as a teaching institution or as a part of the professional curriculum of the College of Medicine. As an arm of the city of Cincinnati its University, just as the city itself, may and does indulge in both governmental and proprietary functions. The maintenance of a faculty hospital, even though it be under the direction of the University itself, does not provide sufficient basis to claim a governmental function as that phrase is used to determine a liability for torts.

For the foregoing reasons, the verdict rendered in the court below against the city of Cincinnati is one rendered against the city in its proprietary capacity, and in this capacity it is amenable to damages in the same manner and to the same extent as any other legal person.

The judgment of the court below is accordingly affirmed.

*Judgment affirmed.*

HILDEBRANT and LONG, JJ., concur.